UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-cv-40011-SLD-3 |
| | ) | |
| DALVENT JERA JACKSON, | ) | |
| | ) | |
| Defendant-Petitioner. | ) | |

ORDER

Before the Court are Defendant-Petitioner Dalvent Jera Jackson's Motion Under 28

U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("2255

Motion"), ECF No. 129, as well as five motions to supplement his 2255 Motion with additional

grounds for relief, ECF Nos. 144, 149, 176, 194, 201.  For the reasons that follow, the motions to

supplement are GRANTED, and the 2255 Motion, as amended and supplemented, is GRANTED

IN PART and DENIED IN PART.

**BACKGROUND**

On February 22, 2017, Jackson and his co-defendants Deaunta Sentrel Tyler ("Deaunta")

and Ledell Seantrel Tyler ("Ledell") were indicted by a grand jury for attempted Hobbs Act

robbery in violation of 18 U.S.C. § 1951 (Count One),[1] possession of firearms in furtherance of a

crime of violence in violation of 18 U.S.C. § 924(c) (Count Two), and possession of firearms by

a felon in violation of 18 U.S.C. § 922(g)(1) (Count Five).  Indictment 1–3, ECF No. 1.  The

indictment arose out of a home invasion.  Three men broke into a family home in Rock Island,

---

[1] Count One also charged completed Hobbs Act robbery in the conjunctive.  Indictment 1–2, ECF No. 1.  At trial,
however, the Government only sought to prove attempted Hobbs Act robbery.  *See, e.g.*, Oct. 30, 2017 Pretrial
Conference Tr. 6:22–24, ECF No. 82 ("[W]hen we charged the case, we charged robbery and attempted robbery in
the conjunctive. And when we go to trial, we're going to seek to prove the attempted robbery . . . .").

Illinois looking for money and drugs.  They held the home's residents at gunpoint, threatened

them, and fired a shot into a stairwell.  Unable to locate any drugs, the men left in a red car.

Later that same evening, two of the victims went to downtown Rock Island to pick someone up.

While downtown, the victims saw the red car the men left in and recognized some of its

occupants as the robbers from earlier that evening.  One of the victims, Elexus Hicks, called the

police.  Police pulled the red car over, but once officers got out of their vehicle to approach it, the

red car took off, leading the police on a high-speed chase.  The red car crashed into a light fixture

and Deaunta, the driver, fled on foot.  Jackson was found in the backseat of the car.

After Jackson's first counsel withdrew, John Lonergan was appointed to represent him.

May 4, 2017 Min. Entry.  The case went to trial, and on November 15, 2017, a jury convicted

Jackson on all three counts.  Jury Verdict 7–9, ECF No. 48.  On April 17, 2018, Jackson was

sentenced to 240 months of imprisonment on Count One and 120 months of imprisonment on

Count Five, to be served concurrently, and 120 months of imprisonment on Count Two to be

served consecutively to the rest of the sentence.  Judgment 1–2, ECF No. 71.  Jackson appealed,

Not. Appeal, ECF No. 77, but his appeal was dismissed after his newly appointed counsel moved

to withdraw, Seventh Circuit Mandate, ECF No. 116.

In September 2020, Jackson filed the 2255 Motion.  *See* 2255 Mot. 12[2] (declaring that the

motion was placed in the prison mailing system on September 27, 2020).  He identifies many

grounds for relief including that his indictment was constitutionally defective under *Rehaif v.

United States*, 588 U.S. 225 (2019), and numerous instances of ineffective assistance of counsel.

2255 Mot. 4–8; Addendum 2–35, ECF No. 129 at 13–49.  Subsequently, he filed two motions to

supplement his pleadings under Federal Rule of Civil Procedure 15 to elaborate on his

_____

[2] The Court uses the page numbers generated by CM/ECF for the 2255 Motion because its internal pagination is
missing one page.

ineffective assistance of counsel claim.  *See* First Mot. Suppl. 11–30; Second Mot. Suppl. 8–25.
He then filed a new § 2255 motion, which the Court treats as another motion to supplement the
2255 Motion.  *See generally* Third Mot. Suppl.  He seeks to add a claim that his conviction on
Count Two must be vacated under *United States v. Taylor*, 596 U.S. 845 (2022), and a claim that
his conviction on Count One must be vacated because evidence regarding Count Two was
presented to convict him on Count One.  Third Mot. Suppl. 4–5.[3]  He then filed another motion
to supplement seeking to add another basis to find his counsel ineffective.  Fourth Mot. Suppl. 2–
5.  He filed a final motion to supplement asking the Court to vacate his career offender
enhancement under *United States v. Ruth*, 966 F.3d 642 (7th Cir. 2020).  Fifth Mot. Supp. 1–3.

The Government filed a response opposing the initial 2255 Motion, arguing that
Jackson's *Rehaif* claim is untimely, and his ineffective assistance of counsel claims are without
merit.  *See* Resp. 2255 Mot. 1–2, ECF No. 132.  At the Court's direction, Mar. 12, 2024 Text
Order, the Government filed a supplemental response conceding that Jackson's conviction on
Count Two should be vacated and otherwise largely standing on its original response, Suppl.
Resp. 3–10, ECF No. 214.[4]

Because of the varied nature of Jackson's claims, the Court provides further factual
background along with its analysis of each claim.

---

[3] The Court uses the page numbers generated by CM/ECF because the internal pagination is missing a page.
[4] The Government also argues that the issues raised for the first time in the motions to supplement were "filed far
beyond the one-year deadline and thus are untimely."  Suppl. Resp. 7.  The Government does not address whether
any of the additional claims relate back to the date of the initial filing.  *See Coleman v. United States*, 79 F.4th 822,
827–28 (7th Cir. 2023) (applying the relation-back principle from Federal Rule of Civil Procedure 15(c)(1)(B) to a
§ 2255 motion).  Because of that omission and because the Court finds other reasons to deny most of Jackson's
added claims, the Court does not address timeliness of the claims in the motions to supplement.

**DISCUSSION**

## I.     Motions to Supplement

"Because the Rules Governing Section 2255 Proceedings . . . do not deal with amendments to motions for collateral review," district courts rely on Federal Rule of Civil Procedure 15 to determine whether to grant a motion to amend.  *Johnson v. United States*, 196 F.3d 802, 805 (7th Cir. 1999).  Under Federal Rule of Civil Procedure 15(a)(2), the court should grant leave to amend "freely . . . when justice so requires."

The Government does not explicitly argue that the Court should deny Jackson leave to amend his 2255 Motion.  Instead, it concedes one of the claims in Jackson's third motion to supplement and otherwise responds to Jackson's additional claims.  *See generally* Suppl. Resp. Accordingly, the Court GRANTS all the motions to supplement, meaning that the Court will consider and rule on all of the claims raised in Jackson's motions.

## II.    Claims

### a.  Legal Standard

A prisoner in federal custody may move the court that imposed his sentence to vacate, set aside, or correct it.  28 U.S.C. § 2255(a).  "[R]elief under § 2255 is an extraordinary remedy because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process."  *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007).  Accordingly, such relief "is available only when the 'sentence was imposed in violation of the Constitution or laws of the United States,' the court lacked jurisdiction, the sentence was greater than the maximum authorized by law, or it is otherwise subject to collateral attack."  *Torzala v. United States*, 545 F.3d 517, 521 (7th Cir. 2008) (quoting 28 U.S.C. § 2255(a)).

4

### b.  Analysis

#### i.   Non-Ineffective Assistance of Counsel Claims

##### 1.  *Taylor* Claim

In his third motion to supplement, Jackson argues that his conviction on Count Two must be vacated in light of *Taylor*.  Third Mot. Suppl. 4.  Count Two charged Jackson with possessing firearms in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c).  Indictment 2. As relevant here, § 924(c)(1)(A)(iii) provides:

> any person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence . . . if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

"[C]rime of violence" is defined as "an offense that is a felony and has as an element the use, attempted use, or threatened use of physical force against the person or property of another."  *Id.* § 924(c)(3)(A).[5]  In *Taylor*, the defendant, who had been convicted of attempted Hobbs Act robbery, conspiracy to commit Hobbs Act robbery, and violation of § 924(c), filed a motion under § 2255, arguing that neither attempted Hobbs Act robbery nor conspiracy to commit Hobbs Act robbery qualifies as a crime of violence under § 924(c).  *Taylor*, 596 U.S. at 848–49. The Supreme Court held that attempted Hobbs Act robbery does not have as an element the use, attempted use, or threatened use of physical force, and thus cannot support a conviction under § 924(c).  *Id.* at 851.

The predicate crime of violence Count Two relied on was the attempted Hobbs Act robbery in Count One.  *See* Indictment 2 (alleging that Defendants "possessed firearms in

---

[5] The statute previously also defined "crime of violence" as "an offense that is a felony and that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  18 U.S.C. § 924(c)(3)(B).  This provision, known as the "residual clause," was declared unconstitutionally vague in *United States v. Davis*, 588 U.S. 445, 447–48, 470 (2019).

5

furtherance of a crime of violence . . . , that is, a violation of Title 18, United States Code, Section 1951, as set forth in Count One of this Indictment"); Verdict 8 (finding Jackson guilty of "Possession of Firearms in Furtherance of Attempted Robbery").  Under *Taylor*, attempted Hobbs Act robbery is not a crime of violence, so Jackson's conviction on Count Two cannot stand.  Indeed, the Government concedes this.  Suppl. Resp. 8.  Accordingly, the Court VACATES Jackson's conviction and sentence on Count Two of the indictment.

"Sentences for multiple offenses are generally treated as packages, so that when part of the package is removed . . . the district court may reconsider the overall sentencing package . . . ."  *United States v. Brazier*, 933 F.3d 796, 801 (7th Cir. 2019) (quotation marks omitted).  Because the mandatory consecutive sentence on Count Two is vacated, the Court will resentence Jackson on the remaining two counts against him: Counts One and Five.  *Francies v. United States*, Nos. 19-2672, 19-2673, & 19-2678, 2022 WL 2763385, at *2 (7th Cir. July 15, 2022) (remanding for resentencing on other counts where the defendants' § 924(c) convictions were vacated due to *Taylor*).  And because the Court will engage in a full resentencing of Jackson, any remaining claims raised in the 2255 Motion and the motions to supplement that relate only to Jackson's sentence—*i.e.*, the claims that counsel was ineffective with respect to sentencing, Addendum 11–15; First Mot. Suppl. 28, and that his sentence must be vacated because he should not have been considered a career offender, Fifth Mot. Suppl. 1—are MOOT.  The Court proceeds, however, to consider any claim that relates to Jackson's convictions on Counts One and Five.

### 2.  Count One Conviction

Jackson also argues in the third motion to supplement that his conviction on Count One must be vacated because evidence related to Count Two was presented as evidence to convict

him at trial on Count One.  Third Mot. Suppl. 5.  He argues that a shell casing found at the scene

was the Government's strongest evidence tying him to the attempted robbery charged in Count

One and that without that evidence, "the jury would have most likely not found him guilty."

Attachment to Third Mot. Suppl. 1–2, ECF No. 176 at 13–15.  The legal basis for this claim is

not clear, but it rests on the premise that if his trial had proceeded only on Count One, the

Government would not have been able to present evidence that a firearm was used during the

attempted Hobbs Act robbery at issue in Count One or that there was a shell casing left at the

scene.  This is a false premise.  Evidence about the manner in which the attempted robbery

occurred, including that the robbers were armed and shot a gun into the stairwell, leaving a shell

casing, would still have been direct, relevant evidence on Count One.  Moreover, Jackson was

charged with possession of a firearm in Count Five, so evidence relating to firearms would still

have been admissible at trial.  This claim is DENIED.

### 3. *Rehaif* Claim

Jackson claims that his conviction on Count Five is unconstitutional because the

indictment did not allege that he knew he was in the category of people prohibited from

possessing guns at the time he committed the offense and because the jury was not instructed that

the Government must prove beyond a reasonable doubt that Jackson knew he was in such a

category.  *See* Addendum 5.  These arguments are based on *Rehaif*, in which the Supreme Court

held that, in a prosecution under 18 U.S.C. § 922(g), "the Government must prove both that the

defendant knew he possessed a firearm and that he knew he belonged to the relevant category of

persons barred from possessing a firearm."  *Rehaif*, 588 U.S. at 237.  The Seventh Circuit has

clarified that under *Rehaif*, the Government is only required to prove that a defendant knew that

he was in a category of people prohibited from possessing firearms, not that being in such a

category meant he was prohibited from possessing firearms.  *United States v. Maez*, 960 F.3d

949, 954–55 (7th Cir. 2020).  As relevant here, the Government would have needed to prove that

Jackson knew he had previously been convicted of an offense punishable by more than one year

of imprisonment, *see* 18 U.S.C. § 922(g)(1), not that Jackson knew that because he had

previously been convicted of such an offense, he was prohibited from possessing a firearm.

 The Court cannot say that Jackson's indictment or conviction on Count Five comply with

*Rehaif*.  As to Count Five, Jackson's indictment reads:

> On or about January 7, 2017, . . . the defendant, Dalvent Jera Jackson, having
> been previously convicted of a crime punishable by imprisonment for a term
> exceeding one year, knowingly possessed firearms and ammunition, that is, a
> Browning .22 caliber semi-automatic handgun, a Daisy[].22 caliber rifle, and .22
> caliber ammunition, said firearms and ammunition having previously traveled in
> interstate and foreign commerce.

Indictment 3 (capitalization altered).  This language is similar to language in a § 922(g)

indictment the Seventh Circuit assumed was defective in *Maez*, as the term "knowingly" falls

after the clause about Jackson's previous conviction and therefore would not typically be

interpreted to apply to that clause.  *See Maez*, 960 F.3d at 966.  Moreover, the jury was instructed

that to find Jackson guilty of Count Five, it needed to find that he "knowingly possessed one or

more firearms, or items of ammunition" and that "[a]t the time of the charged act, [he] was a

felon," Jury Instructions 29, ECF No. 52.[6]  Felon is the shorthand term for a person who has

been convicted of a crime punishable by imprisonment for more than one year.  *See Binderup v.*

---

[6] This is not the most precise jury instruction.  Section 922(g)(1) prohibits firearm possession by anyone who has
been convicted of "a crime punishable by imprisonment for a term exceeding one year."  Typically, a crime
punishable by a term of imprisonment exceeding one year is referred to as a felony.  *See Binderup v. Att'y Gen.
U.S.A.*, 836 F.3d 336, 347 (3d Cir. 2016).  But a § 922(g)(1) conviction can be based on a predicate state
misdemeanor as well, so long as the misdemeanor is punishable by more than two years in prison.  18 U.S.C.
§ 921(a)(20)(B).  "Accordingly, calling the statute a felon dispossession statute is somewhat of a misnomer."
*Kanter v. Barr*, 919 F.3d 437, 439 n.1 (7th Cir. 2019) (quotation marks omitted).

*Att'y Gen. U.S.A.*, 836 F.3d 336, 347 (3d Cir. 2016).)  The jury was not instructed that it needed to find that Jackson knew he was a felon.

The Court must now decide whether it can remedy the *Rehaif* error in this case.  The Government argues that Jackson's *Rehaif* claim is procedurally defaulted and that any error was harmless.  Resp. 2255 Mot. 9; *see* Suppl. Resp. 5 (standing on "its prior response with respect to the *Rehaif*" claim).[7]  Jackson clearly procedurally defaulted a claim that his indictment was defective (or any other claim that his conviction on Count Five should be vacated because the Government failed to prove that he knew he had been convicted of a crime punishable by more than one year) by failing to raise that claim either in his district court proceedings or on appeal. *McCoy v. United States*, 815 F.3d 292, 295 (7th Cir. 2016) ("A claim cannot be raised for the first time in a § 2255 motion if it could have been raised at trial or on direct appeal.").  Indeed, Jackson does not argue otherwise.

But procedural default from failing to raise a claim can be excused "if the prisoner can demonstrate that he is 'actually innocent' of the crimes of which he was convicted" or on a showing of "cause and prejudice for the default."  *Id.*  Both the Government and Jackson focus their cause arguments on whether a *Rehaif*-type claim was available to Jackson, with the Government arguing that "perceived futility does not constitute cause to excuse a procedural default," Resp. 2255 Mot. 15, and Jackson arguing that in some cases, like with *Rehaif*, a change in the law can be cause for a procedural default, Reply 11–15,[8] ECF No. 143.  Jackson is

---

[7] The Government also argues that the *Rehaif* claim is untimely.  Resp. 2255 Mot. 9–10.  It *acknowledges* that Jackson's 2255 Motion was timely because it was filed within one year of the date his conviction became final (October 1, 2019, when his time to file a petition for a writ of certiorari expired), *id.* at 7–9, but argues the *Rehaif* claim contained with the 2255 Motion is untimely because the motion was filed more than one year after the Supreme Court decided *Rehaif* (June 21, 2019), *id.* at 9–10.  Under the clear terms of 28 U.S.C. § 2255(f), this argument fails.  The latest of the relevant dates in § 2255(f) is the date Jackson's conviction became final, so that is the limitations period, even for his *Rehaif* claim.  *See* 28 U.S.C. § 2255(f) (providing that a "1-year period of limitation shall apply to a" § 2255 motion and that the period runs from "the latest of" four possible dates).

[8] Again, the Court uses the CM/ECF generated page numbers.

ultimately correct.   "A change in the law may constitute cause for a procedural default if it creates a claim that is so novel that its legal basis is not reasonably available to counsel." *Cross v. United States*, 892 F.3d 288, 295 (7th Cir. 2018) (quotation marks omitted).   But neither side acknowledges a fundamental problem with application of this theory to this case: *Rehaif* was decided while Jackson's direct appeal was still pending.   *Rehaif* was decided on June 21, 2019, *see Rehaif*, 588 U.S. 225, while Jackson's appeal was decided July 1, 2019, *see United States v. Tyler*, 780 F. App'x 360 (7th Cir. 2019).   Jackson could have sought to raise the *Rehaif* issue in his appeal.   Having identified no other cause for his procedural default, Jackson cannot overcome his procedural default through the cause-and-prejudice approach.

The Government argues that Jackson cannot show actual innocence either.   Resp. 2255 Mot. 16.   Although Jackson does not specifically argue that he can show actual innocence, he does argue that he was not aware of his felon status.   Reply 14–17.   Accordingly, the Court will assess whether Jackson can use the actual innocence exception to ovecome his procedural default.   *See McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) ("[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations.").

"Tenable actual-innocence gateway pleas are rare: [A] petitioner does not meet the threshold requirement unless he persuades the district court that . . . no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* (first alteration in original) (quotation marks omitted).   Jackson fails to meet that burden.   According to the presentence investigation report ("PSR"), prior to commission of the instant offense, Jackson had been convicted of delivery of a controlled substance for which he was initially sentenced to four years of probation.   PSR ¶ 61, ECF No. 61.   After violating his probation, Jackson was sentenced to

10

four years of imprisonment.  *Id.*  It would be implausible for Jackson to argue that he did not

know he had previously been convicted of an offense punishable by more than one year of

imprisonment when he was in fact sentenced to a term of four years of imprisonment.  Jackson,

however, argues that he was not aware of his status because "his state attorney notified him that

upon his release from the prior offenses he would file a motion to expunge the charges from his

record and he could proceed with his life as usual."  Reply 16–17; *see also* Jackson Aff. ¶ 3, ECF

No. 143 at 3–4 ("I was notified by my attorney that once I was released from custody on the state

charges of delivery of controlled substance my record would be expunged because it was only a

probated sentence."); *id.* ¶ 4 ("I understood the definition of a probated sentence to mean that I

would not have a conviction on my record.").  Jackson submits no evidence that his conviction

was actually expunged.

  "What constitutes a conviction of [a crime punishable by imprisonment for a term

exceeding one year] shall be determined in accordance with the law of the jurisdiction in which

the proceedings were held."  18 U.S.C. § 921(a)(2).  However, § 921(a)(20) carves some

convictions out of § 922(g)(1).  As relevant here,

> any conviction which has been expunged, or set aside or for which a person has
> been pardoned or has had civil rights restored shall not be considered a conviction
> for purposes of this chapter, unless such pardon, expungement, or restoration of
> civil rights expressly provides that the person may not ship, transport, possess, or
> receive firearms.

*Id.* § 921(a)(20).  The Seventh Circuit has described the exceptions set forth in § 921(a)(2) as

"essentially an affirmative defense to a criminal charge under 18 U.S.C. § 922(g)(1)" and held

that "[i]t is a defendant's responsibility to raise this issue and to produce evidence" showing that

a conviction was expunged or that his civil rights have been restored "before the matter may be

presented to the jury for resolution."  *United States v. Foster*, 652 F.3d 776, 791 (7th Cir. 2011).

In other words, the exceptions in § 921(a)(2) are not "an element of the offense described in section 922(g)." *Id.* at 792.  Some courts in this district have concluded that *Rehaif* does not overrule *Foster* and transform the exceptions into an element of the offense under which the Government would have to prove that a defendant knew that his civil rights had *not* been restored or that his conviction had *not* been expunged.  *See Alexander v. Entzel*, No. 1:19-cv-1301, 2020 WL 1068060, at *3 (C.D. Ill. Mar. 5, 2020) (McDade, J.); *Clark v. Entzel*, No. 19-cv-1305-JES, 2020 WL 13590039, at *3 (C.D. Ill. Jan. 13, 2020) (Shadid, J.).  The Eighth Circuit, by contrast, has said that "a person who has been convicted of a felony but has had his rights restored does not actually have a qualifying conviction for § 922(g)(1)—and is therefore not in the relevant category of persons barred from possessing a firearm," so "[a]fter *Rehaif*, it may be that a defendant who genuinely but mistakenly believes that he has had his individual rights restored has a valid defense to a felon-in-possession charge." *United States v. Robinson*, 982 F.3d 1181, 1186 (8th Cir. 2020).

Given the Seventh Circuit's ruling in *Foster* that the exceptions in § 921(a)(2) are not an element of a § 922(g)(1) offense, the Court doubts that it would entertain an argument that a mistaken belief that a conviction had been expunged would negate an element of the offense. But even if that were the law, Jackson has not alleged facts that, if proven, would sustain his burden to prove his actual innocence—that is, that no reasonable juror would have found him guilty.  Jackson does not contend that he was unaware that he had been convicted of an offense punishable by more than one year in the past and, as mentioned above, any such contention is contradicted by the record considering his four-year prison term.  Jackson's affidavit states only that an unspecified attorney notified him at an unspecified time that the conviction would be expunged because it was a "probated" sentence and that he thought a "probated" offense meant

he would not have a conviction on his record.  Jackson Aff. ¶¶ 3–4.  These non-specific allegations are not sufficient to sustain his burden.

The Court finds that Jackson's *Rehaif* claim is procedurally defaulted, and Jackson has not established either cause and prejudice or actual innocence to excuse his default.  His *Rehaif* claim is therefore DENIED.

### ii.  Ineffective Assistance of Counsel Claims

The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel.  U.S. Const. am. VI.  This right to counsel extends to filing a direct appeal from a criminal conviction.  *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986) ("The right to appellate counsel is now firmly established.").  Claims of ineffective assistance of counsel are subject to the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  This test requires a defendant to show that his counsel's performance "fell below an objective standard of reasonableness" and that he suffered prejudice as a result.  *Id.* at 688, 692.  To demonstrate prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

Jackson identifies many instances of alleged ineffective assistance of counsel by Lonergan, his trial counsel, arising out of his pretrial proceedings, trial, and sentencing and two instances of alleged ineffective assistance of appellate counsel.

### 1.  Suppress Identifications

Jackson argues that Lonergan was ineffective for failing to move for suppression of evidence that two victims of the offense, Hicks and D'Gorgio Stacy, identified him in a photo lineup.  *See* Addendum 33–35.  Jackson states that he was arrested after being found in the backseat of the car, taken to the police station, and placed in a holding cell alone.  *Id.* at 33–34.

He alleges that Stacy and Hicks stared at him in the cell through two-way glass for about an hour before they were asked to identify suspects in a photo lineup. *Id.* at 34. Jackson states that he informed Lonergan that Stacy and Hicks had been able to see him prior to the lineup and argues that the procedure was unnecessary and suggestive and Lonergan should have filed a motion to suppress the identifications. *Id.* at 34–35. The Government claims that the record conflicts with Jackson's arguments because Lonergan states that Jackson never told him that Stacy and Hicks had seen him in a holding cell prior to the photo array and because the evidence at trial showed that Jackson, Deaunta, and Ledell were transported from the scene of the crash to the Rock Island County Jail and the victims were transported to the police station. Resp. 2255 Mot. 37–38 (citing Lonergan Aff. ¶ 10, ECF No. 132-1).

Even if everything Jackson says is true,[9] he cannot show prejudice. "Due process forbids law enforcement from using an identification procedure that is both suggestive and unnecessary." *United States v. Jones*, 872 F.3d 483, 490 (7th Cir. 2017) (quotation marks omitted). But even if the photo array identification were suppressed, multiple other in- and out-of-court identifications were presented to the jury. For example, Hicks testified that she identified Defendants as the robbers when she saw them at the scene of the crash. *See* Trial Tr. Day One 150:8–14, 201:14-202:1, ECF No. 91. Stacy also testified that he identified Defendants as the robbers at the scene of the crash. Trial Tr. Day Two 243:23–244:4, ECF No. 92. Hicks and Stacy also both identified Jackson in court. *See* Trial Tr. Day One 135:24-136:19 (Hicks); Trial Tr. Day Two 236:17-237:11 (Stacy). Jackson makes no argument that these other identifications should have been excluded.

---

[9] The Government's representation of the evidence at trial is inaccurate. Rock Island Police Officer Zachary Costas testified that he transported Jackson from the crash scene to the Rock Island Police Department, not the jail. Trial Tr. Day Two 385:25–386:4, ECF No. 92.

Even if an out-of-court identification was unnecessarily suggestive, an in-court identification is admissible if there is "an independent basis of reliability." *United States v. Sanders*, 708 F.3d 976, 984 (7th Cir. 2013). To determine whether there was an independent basis for reliability, the court considers:

> 1) the witness' opportunity to view the suspect at the scene of the crime; (2) the witness' degree of attention at the scene; (3) the accuracy of his pre-identification description of the suspect; (4) the witness' level of certainty in the identification; and (5) the time elapsed between the crime and the identification.

*United States v. Rogers*, 387 F.3d 925, 938 (7th Cir. 2004). Even a cursory analysis of these factors suggests that the in-court identifications would be admissible. Hicks and Stacy had at least thirty to forty-five minutes to observe the robbers. *See, e.g.* Trial Tr. Day One 139:25–140:3 (Hicks testifying that the robbers were in the house for thirty to forty-five minutes). None of the robbers had masks or face coverings on. *Id.* at 134:14-19. And Hicks and Stacy both provided a description of what one of the robbers was wearing that matched what Jackson was wearing when he was arrested. Hicks testified that during the robbery, Jackson was wearing "[a] black Pelle" jacket, *id.* at 157:20–24, 158:11–17, and glasses with no lenses in them, *id.* at 212:11–17. Stacy testified that Jackson was wearing "a black coat . . . with some black shoes, and . . . some white glasses." Trial Tr. Day Two 238:6–9. Jackson was wearing a black Pelle jacket when he was arrested. *Id.* at 386:24–387:4. Thus, even if a motion to suppress the photo array had been successful, the in-court identifications would make such a motion to suppress essentially meaningless. *Cf. Pittman v. Warden, Pontiac Corr. Ctr.*, 960 F.2d 688, 691 (7th Cir. 1992) (concluding that even if a motion to suppress a photo lineup had been successful, it would have been "meaningless" because two witnesses "might still have been allowed to identify both [the defendant] and his gun during trial").

15

## 2. Due Process Violations

Jackson argues that Lonergan and appellate counsel were ineffective for failing to raise a number of alleged due process violations arising out of the state court prosecution that preceded this case. *See* First Mot. Suppl. 21–26. All the due process arguments are either meritless or based on mere speculation. Defendants were first charged in state court, but the state case was dismissed after Defendants were indicted federally. *See* PSR ¶ 83. One of Jackson's arguments is that a detective testified falsely at the preliminary hearing for the state case and the state prosecutor should have turned this exculpatory evidence over to the federal prosecution. First Mot. Suppl. 21–23. But the Government could not have suppressed testimony given at a public hearing at which the defendant was present. *United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992) ("Evidence cannot be regarded as 'suppressed' when the defendant has access to the evidence before trial by the exercise of reasonable diligence."); *cf. United States v. Shields*, 789 F.3d 733, 747 (7th Cir. 2015) (finding that the defendant could not demonstrate that the Government suppressed evidence where the evidence at issue—the fact that a lawsuit had been filed against the City of Chicago and an officer involved in the investigation of the defendant's case—"ha[d] been publicly available since 2004"). Jackson also argues that the "prosecutor"— unclear whether he means the state prosecutor or the Government prosecutor—"withheld the 911 dispatch call" and "a copy of the fingerprint reports of each relevant laboratory or data test." First Mot. Suppl. 24. He submits nothing beyond his vague statements to prove that these pieces of evidence were withheld or that they would be exculpatory to him.

Another argument Jackson wants his attorneys to have made is that a Rock Island "police detective . . . created false evidence by fabricating fingerprint[s], coaching the witnesses, planting drugs, and tamper[ing] with evidence by destroying . . . Jackson's cell phone." *Id.* at

22–23.  Regarding the fingerprints, Jackson claims that at a motion to suppress hearing in the state case, the state said Jackson's fingerprints were not found in the investigation, "only a partial palm print was found on the handgun."  *Id.* at 22.  Jackson states that he informed Lonergan and his appellate attorney that the detective fabricated evidence, but he provides no evidence to support any of the allegations.

Another argument Jackson wants his counsel to have made is that the Bureau of Alcohol, Tobacco, and Firearms offered to bribe him to take responsibility for the firearm.  *Id.* at 23, 25. Jackson states that he showed Lonergan and his appellate attorney letters demonstrating these bribes, but again offers no evidence to support his contention.

In sum, Jackson offers no specific allegations that, if true, would show that Lonergan or appellate counsel performed deficiently by failing to raise these arguments.

### 3.  Investigate Alibi

Jackson argues that counsel was ineffective for failing to investigate his alibi and call witnesses to support an alibi defense at trial.  Addendum 23.  He claims that he informed Lonergan that at the time of the robbery, he was at Meeko Brown's house in East Moline with David Price.  *Id.*  Jackson claims he also informed counsel that he had a cell phone with him at the time and that his cell phone records would show he was in the vicinity of Brown's house.  *Id.* Jackson claims that Lonergan did not investigate his alibi.  *Id.*  The Government argues that counsel's decision of whether or not to call a witness is generally not subject to review and that Jackson has provided nothing but speculation about what his proposed witnesses would testify to.  Resp. 2255 Mot. 32–33.

Lonergan states that he discussed an alibi defense with Jackson "while preparing for trial."  Lonergan Aff. ¶ 7.  No alibi defense was raised, however.  Lonergan could find "no

reference to" the witnesses Jackson identifies—Price and Brown—in his file. *Id.* Lonergan's file indicated that "Jackson provided names of only 2 potential witnesses and neither one was an alibi witness." *Id.* Brown was not one of the names. *Id.* Lonergan's file also indicates that Jackson had other witnesses, but they did not want to be involved for fear of being involved with federal law enforcement. *Id.*

If true that Jackson told Lonergan the names of two alibi witnesses or that his cell phone records would prove his alibi,[10] Lonergan should have at least investigated or made a decision that no investigation was necessary. *See Washington v. Smith*, 219 F.3d 620, 631 (7th Cir. 2000) ("[An attorney owes his client] a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." (quotation marks omitted)).

But even if Lonergan performed deficiently by failing to conduct a reasonable investigation, Jackson has not alleged facts that, if true, would establish prejudice. "[A] petitioner alleging that counsel's ineffectiveness was centered on a supposed failure to investigate has the burden of providing the court sufficiently precise information, that is, a comprehensive showing as to what the investigation would have produced." *Hardamon v. United States*, 319 F.3d 943, 951 (7th Cir. 2003) (quotation marks omitted). And "even incarcerated movants must demonstrate, with some precision, the content of the testimony [the potential witnesses] would have given at trial." *Kratz v. United States*, 79 F. App'x 932, 934 (7th Cir. 2003) (alteration in original) (quotation marks omitted). Here, Jackson provides only speculation that cell phone records would show he was not in the vicinity of the crime, and he does not specify what Brown or Price would testify to. Without identifying what an

---

[10] The Court notes that officers testified at trial that they did not locate a cell phone belonging to Jackson and, moreover, elsewhere in his 2255 briefing, Jackson claims that his cell phone was destroyed by the Rock Island police, *see* First Mot. Suppl. 23.

investigation would have uncovered, Jackson cannot meet his burden of showing that there is a reasonable probability the outcome of his trial would have been different.

### 4. Fingerprint Expert

Garrett Alderson, crime scene investigator for the Rock Island Police Department, testified that latent prints were recovered from both guns involved in the offense and a latent palm print was recovered from one of the guns and that each of those latent prints was identified as coming from Jackson. *See* Trial Tr. Day Two 483:18-484:1. Jackson argues that his counsel was deficient because he failed to consult a fingerprint expert "to analyze the conclusions of the [G]overnment's fingerprint expert and to assist him in confronting that evidence." 2255 Mot. 7. Jackson claims that because he "consistently maintained [that] he was not at the scene of the crime . . . his counsel should have investigated the conflict between the objective evidence placing him . . . at the scene of the crime." Addendum 17–18. The Government argues that Jackson's claim is based on nothing more than speculation which is insufficient to prove a constitutional violation. Resp. 2255 Mot. 27–28.

Jackson cannot establish either prong of the *Strickland* test. With respect to deficient performance, "he has not identified an 'expert capable of supporting the defense [who] was reasonably available at the time of trial.'" *Resnick v. United States*, 7 F.4th 611, 621 (7th Cir. 2021) (alteration in original) (quoting *Ellison v. Acevedo*, 593 F.3d 625, 634 (7th Cir. 2010)). Moreover, Lonergan has identified two strategic reasons for foregoing a fingerprint expert. First, he did not think "contesting the accuracy of the fingerprint evidence would be productive given the corroborative evidence in the case"—meaning the "eyewitness identifications, [Jackson's] presence in the car with the other suspects, the presence of the gun in the car with [Jackson, Deaunta, and Ledell], [and] the ballistics evidence that one gun found in the car was discharged

at the location of the robbery"—and second, he thought any fingerprint expert "could only offer potential arguments concerning the validity of the Governments [sic] expert witness" rather than helping to "exclude the fingerprint evidence."  Lonergan Aff. ¶ 2.  Rather than using a competing expert to challenge Alderson's testimony, Lonergan cross-examined Alderson, Trial Tr. Day Two 496:23–504:7, and tried to undermine the certainty of his testimony by, for example, getting him to agree that he could not always tell if two partial prints came from different people, *id.* at 503:24–504:6.  And in closing arguments, Lonergan argued that the jury could reasonably conclude that Jackson's prints did not match the latent prints found on the guns but that even if the jury credited Alderson's testimony, all it would show was that Jackson's fingers touched the guns, not that he participated in the robbery.  *See* Trial Tr. Day Three 764:14-22, ECF No. 93 ("[G]iving Mr. Alderson the benefit of the doubt, let's say that is my client's fingerprint. . . . His fingerprint on that gun is a fingerprint on that gun.  It proves that his finger perhaps touched that gun.  It does not prove that he was at this house when this robbery occurred.").

The Court defers to Lonergan's strategic decision because Jackson does not provide enough evidence or argument to rebut the presumption that it falls within the wide range of reasonable assistance.  *Shaw v. Wilson*, 721 F.3d 908, 914 (7th Cir. 2013) ("Courts must defer to any strategic decision the lawyer made that falls within the wide range of reasonable professional assistance." (quotation marks omitted)); *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) ("Counsel's competence . . . is presumed and the defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." (citation omitted)).  He merely cites to a case where the Seventh Circuit found that failure to consult experts was deficient performance.  Addendum 17–18 (citing *Miller v. Anderson*, 255 F.3d 455 (7th Cir. 2001), *judgment modified in*

*other respects*, 268 F.3d 485 (7th Cir. 2001)).  The Seventh Circuit made clear, however, that its decision was based on the circumstances of that case, which included: that there were no witnesses to the crime; the "defense was that [the defendant] had not been at the scene of the crime"; an accomplice's testimony was the "centerpiece of the state's case" but contained contradictions and was "induced, in part . . . , by the state's promise not to seek the death penalty for him"; the accomplice had a significant criminal history; and the state produced DNA evidence "that it admitted was inconclusive" and did not present "tire-tread and footprint evidence that it had said in opening argument it would present." *Id.* at 457, 459.  There was one piece of physical evidence corroborating the defendant's connection to the crime—a pubic hair that a state expert testified was "almost certainly" from the defendant. *Id.* at 457.  And, importantly, the defendant's postconviction counsel had hired a "highly experienced hair expert" that "testified that the hair was like the victim's hair and unlike" the defendant's hair. *Id.* at 457; *see Ellison*, 593 F.3d at 634 (citing *Miller* for the proposition that "[i]f the need for an expert was clear and one was reasonably available, counsel should at least consult with one").  The circumstances of this case are quite different.  Again, Jackson has identified no expert that was available.  He also did not put forth an alibi defense.  And, unlike in *Miller*, there were multiple pieces of both physical and non-physical evidence implicating Jackson.

Jackson has no evidence to prove prejudice either.  All he has is speculation that a competing expert *could have* concluded that the latent prints did not match Jackson's prints. *See* Addendum 17–18 (arguing only that if his assertion that he was not at the scene of the crime was "confirmed by an independent fingerprint expert," the Government's fingerprint expert would not have corroborated the witnesses' testimony).  This is not sufficient. *See United States v. Anderson*, 61 F.3d 1290, 1298–99 (7th Cir. 1995) ("Neither the record nor Mr. Anderson

suggests how his purported rebuttal [expert] witnesses would have testified or how they could have changed the result in this case.  Accordingly, we cannot conclude that Mr. Anderson's trial counsel rendered ineffective assistance by failing to call these unnamed witnesses."); *cf. United States v. Traeger*, 289 F.3d 461, 472 (7th Cir. 2002) ("A defendant's speculation about what evidence might have been found is insufficient to demonstrate prejudice—he must show what the evidence would have been and how it would have produced a different result.").

### 5.  Ballistics Expert

Illinois State Police forensic scientist Jason List testified that he conducted an analysis of the firearms found in the red car and the bullet and shell casing found at the scene of the robbery and concluded that the handgun found in the red car fired the bullet and ejected the shell casing. Trial Tr. Day Three 545:23–546:3.  Jackson argues that, for similar reasons as the prior ground, Lonergan was ineffective for failing to obtain a ballistics expert to challenge the Government's ballistics expert.  Addendum 18–20.  The Government argues that this claim should be denied because it rests on mere speculation.  Resp. 2255 Mot. 29–30.

For the same reasons the Court found that Jackson had failed to establish either prong of the *Strickland* test with respect to a fingerprint expert, it concludes that Jackson has failed to establish either prong with respect to a ballistics expert.  As to deficient performance, Jackson has not demonstrated that an expert was available.  Moreover, Lonergan has identified strategic reasons for failing to consult with a ballistics expert, *see* Lonergan Aff. ¶ 3 (stating that he did not think "any expert would help to exclude the ballistics evidence but" instead "could only offer potential arguments concerning the validity of the Governments [sic] expert witness" and given all the corroborating evidence, he did not think "that contesting the accuracy of the ballistics evidence would be productive"), and Jackson has not rebutted the presumption that those were

22

within the range of reasonable assistance.  Moreover, he cannot establish prejudice because he can only speculate that a competing expert would conclude that the "spent shell casing found at the scene of the crime did not match any of the firearms that were discovered secreted in" the red car.  Addendum 19.

### 6.  Audio Expert

Jackson's next two arguments relate to an audio recording of a conversation between Jackson and the mother of his children, Charity Engholm, that was played at trial.  Engholm visited Jackson at the Rock Island County Jail, and their conversation was recorded.  *See* Trial Tr. Day Three 631:17–634:1.  On the recording, "Jackson and . . . Engholm discuss[ed] trying to influence the victim or victims within the case."  *Id.* at 629:16–18.  Jackson states that Lonergan visited him at the Mercer County jail and played the audio recording for him.  Addendum 19. Jackson states that he "informed [Lonergan] that significant portions of the conversation . . . w[ere] omitted in the recording to include, but not limited to, [Engholm] stating she had spoken to [Hicks] and it was she who broached the subject of recanting the inculpatory accusation against [Jackson] in exchange for $5,000."  *Id.* at 20.  Jackson argues that counsel was ineffective for failing to retain an audio expert to consult about the missing portions of the recording.  *See id.* at 19–20.  The Government argues that the evidence does not support Jackson's claim and that he has failed to prove prejudice.  Resp. 2255 Mot. 30–32.

The record conflicts with Jackson's claim of missing audio and his underlying claim that Hicks asked Engholm asked for payment in exchange for recanting her statement.  As to the audio recording, Lonergan states in his affidavit that at one point during trial preparation, Jackson believed a portion of a jail call recording was missing but they were able to identify the portion he believed was missing either within the original recording or in a different recording.

Lonergan Aff. ¶ 4.  He states that "no expert was needed to analyze the jail recordings as [he] had no evidence to suggest that the recordings were anything other than authentic." *Id.*  While competing affidavits from the defendant and his attorney require an evidentiary hearing, *Daniels v. United States*, 54 F.3d 290, 295 (7th Cir. 1995), Jackson fails to provide any evidence to contradict Lonergan's statement that although Jackson initially believed parts of the recording were missing, they were able to locate those missing parts and Lonergan understood that Jackson's concern had been resolved.  On the underlying facts, Hicks testified that Engholm messaged her on Facebook, that they subsequently spoke on the phone, that Engholm told Hicks that she had cancer, and that Engholm asked Hicks if she could pay Hicks "not to go to court on [Jackson]."  Trial Tr. Day One 161:13–25.  A screenshot of the Facebook message from Engholm to Hicks was admitted at trial.  *See id.* at 163:3–19; Trial Tr. Day Three 627:4–19, 636:8–16.  Moreover, Engholm pleaded guilty to attempted tampering with a witness and conspiracy to tamper with a witness based on her offer of money in exchange for Hicks recanting her statements and was sentenced to 42 months of imprisonment, *see* Judgment, *United States v. Engholm*, 4:17-cr-40065, ECF No. 27.  There is simply no evidence to support Jackson's claim that Hicks asked for payment in exchange for recanting her statement or that there were portions of the recording missing.

Moreover, even if portions of the recording were missing, for similar reasons as the prior two claims, Jackson has failed to establish deficient performance or prejudice.  Jackson does not identify an expert that was reasonably available and has not even identified what such an expert would testify about or how it would impact the case.

### 7.  Audio Recordings

Jackson similarly argues that Lonergan performed deficiently because he failed to object to admission of the audio recording at trial under Federal Rule of Evidence 901 or Federal Rule of Evidence 403.  Addendum 20–22.  The Government again argues that the record does not support Jackson's claims, and that Jackson has failed to prove prejudice.  Resp. 2255 Mot. 30–32.

Federal Rule of Evidence 901(a) states that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Jackson argues that the Rock Island County Jail official who testified about the recording "did not testify that the equipment used to record the conversation between" Engholm and Jackson "produced accurate results and that the audio offered in court was a fair and accurate reproduction of the conversation that occurred."  Addendum 20–21.  Lonergan states that he "believed that [he and Jackson] had agreed that there was no evidence of tampering, editing or erasing portions of the recording" and that he "did not believe that [he] had any grounds upon which [to] . . . base such an objection."  Lonergan Aff. ¶ 5.  Jackson presents no evidence to contradict Lonergan's statement that he had no reason to believe the audio recording was inaccurate.  It was not deficient performance to forego an authenticity objection where Lonergan had no reason to think the Government would be unable to prove that the recording was authentic.

Federal Rule of Evidence 403 allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Jackson argues that the audio recording of his conversation with

Engholm was "unfairly prejudicial because (1) the recording announced it was recorded at the Rock Island County Jail, (2) was used as prior bad acts evidence, and (3) as propensity evidence." Addendum 22. Counsel did not perform deficiently by failing to object to the recording on these bases. Evidence of a defendant's attempt to bribe a witness is admissible under Federal Rule of Evidence 404(b)—which prohibits evidence of other bad acts to prove character—when used to establish consciousness of guilt. *United States v. Poulson*, 655 F.3d 492, 508–09 (6th Cir. 2011); *see United States v. Henderson*, 58 F.3d 1145, 1150 (7th Cir. 1995) ("We have long accepted the admission of evidence of the defendant's attempts to influence a prosecution witness as evincing his guilty conscience for the underlying crimes."). And Lonergan would have no basis to claim that the risk of unfair prejudice would substantially outweigh the probative value of the evidence, such that exclusion under Rule 403 would be proper. Certainly, the audio recording is prejudicial to Jackson, but there is nothing unfairly prejudicial about it. *Cf. United States v. Hicks*, 368 F.3d 801, 807 (7th Cir. 2004) ("[M]ost relevant evidence, by its very nature, is prejudicial[.] [O]nly *unfairly* prejudicial evidence *must* be excluded.").

Accordingly, the Court concludes that Lonergan did not perform deficiently by failing to contest the authenticity of the recording and failing to argue for its exclusion under Rule 403.

## 8. Video Recordings

Jackson argues that Lonergan was ineffective for failing to object to three videos played at trial or, in the alternative, request limiting instructions. Addendum 25–27. The first video he is referring to is a video of the high-speed vehicle pursuit and subsequent foot chase of Deaunta; Jackson argues that this was unfairly prejudicial to him and Lonergan should have objected to its admission or asked for a limiting instruction informing the jury it could only consider the video

as evidence of Deaunta's consciousness of guilt. *Id.* at 25. The second video showed Jackson sitting in the backseat of a police car; Jackson argues that the video was not relevant because it merely shows him remaining silent and was prejudicial to the extent it commented on his right to remain silent. *See id.* at 26. The third video showed Jackson in "jailhouse garb . . . being fingerprinted" by a jail guard. *Id.* Jackson argues that this evidence and testimony of the guard was "redundant and calculated to inflame the passions or prejudices of the jury." *Id.* The Government argues that "[t]he videos were relevant to establish the defendants' involvement in the robbery or to rebut claims made by the defendants during the course of the trial." Resp. 2255 Mot. 33.

Jackson has failed to show deficient performance with respect to the first video. Jackson does not identify on what basis Lonergan should have objected to admission of the video or requested a limiting instruction. The chase is indisputably relevant evidence. Jackson simply complains that the Government used it to demonstrate his consciousness of guilt when it only shows the driver Deaunta's consciousness of guilt. Addendum 25. He has failed to support this argument with any relevant caselaw to support that Lonergan had a basis for objecting or requesting a limiting instruction. While the video was no doubt prejudicial to Jackson, he has not identified why it was unfairly so.

Jackson has failed to show deficient performance with respect to the second video too. It is unclear what video Jackson is referring to and on what basis he thinks Lonergan should have objected to such a video. If Jackson is arguing that playing a video depicting a defendant being silent in the back of a police car violates the defendant's right to remain silent, that argument is misplaced. "[I]t is a violation of the [F]ifth [A]mendment privilege against self-incrimination for a prosecutor to directly and adversely comment on the defendant's failure to testify on his own

behalf." *United States v. Butler*, 71 F.3d 243, 254 (7th Cir. 1995) (citing *Griffin v. California*, 380 U.S. 609 (1965)).  "[A]n *indirect* comment on the defendant's failure to testify may also violate the [F]ifth [A]mendment if the remark was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Id.* (quotation marks omitted).   The Court fails to see how playing a video of a defendant sitting the back of a police car could possibly be considered to violate Jackson's Fifth Amendment rights.

Jackson has failed to show deficient performance with respect to the third video as well. Aimee Roberts from the Rock Island County Jail testified that she took Jackson's fingerprints when he was booked at the jail after his arrest the night of the robbery.  *See* Trial Tr. Day Two 463:20–465:19.  Along with her testimony, the Government played a video of Roberts taking Jackson's fingerprints.  *E.g.*, *id.* at 465:11–19.  Lonergan did not cross-examine Roberts or object to admission of the video.  Jackson argues that counsel should have stipulated that Jackson's fingerprints were taken and objected that playing the video was unfairly prejudicial because it showed him in "jailhouse garb."  Addendum 27.

Jackson does not state that he was willing to stipulate that his fingerprints were taken, and if he were not, a Rule 403 objection would be a nonstarter.  Even if he had been willing to stipulate, it is not clear that a Rule 403 objection would have been successful.  With one limited exception not relevant to this claim, "a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it," *United States v. West*, 53 F.4th 1104, 1107 (7th Cir. 2022) (quotation marks omitted), though "availability of other means of proof is an appropriate factor to consider in determining the relevance of an item of evidence," *United States v. Loughry*, 660 F.3d 965, 974 (7th Cir. 2011).  Particularly where

Jackson was challenging the validity of the fingerprint evidence, the Government was entitled to prove when and how Jackson's fingerprints were taken. This was highly probative evidence and the mere fact that it showed that he had been incarcerated does not create a risk of unfair prejudice so high as to warrant exclusion of the evidence. *Cf. United States v. Johnson*, 624 F.3d 815, 821–22 (7th Cir. 2010) (holding that the "occasional reference to the fact that" a defendant was incarcerated prior to trial is not highly prejudicial). In any case, the evidence of the audio recording of Jackson's conversation with Engholm revealed that Jackson was detained prior to trial anyway, so the fingerprint video did not add any new information for the jury. *Cf. United States v. Thomas*, 933 F.3d 685, 691 (7th Cir. 2019) ("[T]he risk of unfair prejudice here was reduced. The jury was already aware through other, proper evidence that Thomas had a criminal history. . . . Thomas's criminal past was already before the jury, and the likelihood that this aspect of Officer Ellestad's testimony had any effect on the jury is negligible." (quotation marks omitted)). Moreover, the testimony and video were not needlessly cumulative, given that Roberts's testimony and the video were short—Roberts's testimony takes only four pages of a more than 800-page trial transcript. *See West*, 53 F.4th at 1108 ("Evidence may be deemed needlessly cumulative when it adds very little to the probative force of the other evidence in the case, such that its contribution to the determination of truth would be outweighed by its contribution to the length of the trial." (quotation marks omitted)).

### 9. Closing Argument

Jackson claims that Lonergan was ineffective because he made statements casting Jackson in a poor light in his closing argument and these statements deprived Jackson of a fair trial. Addendum 28 ("During closing argument Mr. Lonergan essentially argued that Mr. Jackson is an unethical and immoral person who hails from a place where individuals have no

moral[s] . . . , and that because of his origins he was only doing what anyone from that environment would do when charged with a crime – bribe a key witness."). The Government argues that Lonergan's statement was strategic, that he actually questioned Hicks's integrity, not Jackson's, and that Jackson cannot prove prejudice. Resp. 2255 Mot. 34–36.

Jackson's argument refers to a part of Lonergan's closing argument in which Lonergan was trying to explain and make less prejudicial the audio recording of Jackson and Engholm discussing bribing witnesses. First, Lonergan noted that on the audio recording, Jackson never confessed his guilt or told Engholm explicitly to ask Hicks to lie; instead, he just told Engholm to talk to Hicks. Trial Tr. Day Three 766:8–17. Lonergan said that if he himself were arrested for a crime he did not commit, he would also talk to his family or his lawyer and ask them to talk to the person who misidentified him and make sure that person knew he was not the culprit. Trial Tr. Day Three 766:18–23. Though he did not use the term "jungle" as Jackson claims, *see* Addendum 28, Lonergan then said that Jackson did not exist in the same world as him—meaning his "middle-class upbringing" or his "middle-class life-style," Trial Tr. Day Three 767:9–11— and that instead Jackson existed "in the world with people like" Stacy and Hicks, *id.* at 766:24– 767:1. Lonergan said that world "is a different place, and people are somewhat different in their values" in that world. *Id.* at 767:11–13. Lonergan argued that Hicks was "not the kind of person who[ was] going to do the right thing out of the goodness of her heart." *Id.* at 767:1–4. He noted that Hicks admitted that she stole and smoked weed all day. *Id.* at 767:14–18. And he suggested that she may have made an honest mistake in identifying Jackson but still asked for money to clear it up. *Id.* at 767:4–9; *id.* at 767:19–20 ("So, maybe she needs a little financial incentive.").

Lonergan states that he "did not feel [that he] could *not* mention" the audio recording of Jackson "apparently asking his friend to offer a bribe to a witness." Lonergan Aff. ¶ 8. He made

a "strategic decision" to address the evidence by calling Hicks unethical as he "felt it was the only spin that [he] could put on [it] . . . that could possibly offer some explanation." *Id.*  Jackson offers nothing to rebut the presumption that Lonergan's strategic decision was reasonable. *See Kimmelman*, 477 U.S. at 384.  While Lonergan's comments were inartful in that they suggest that Jackson is part of a world with people who have different values, who steal, and who do drugs, it is clear that the thrust of the argument was to discredit Hicks and offer an alternative understanding of the audio recording: that Jackson simply asked Engholm to reach out to Hicks to tell her she was mistaken and it was Hicks who said she would need payment to correct her mistake.  Perhaps this was not an effective argument, and the jury may not have believed it, but that does not mean it was not a strategic choice on Lonergan's part. *See Corral v. Foster*, 4 F.4th 576, 586 (7th Cir. 2021) ("[S]o long as an attorney articulates a strategic reason for a decision that was sound at the time it was made, the decision generally cannot support a claim of ineffective assistance of counsel.  This is true even when, in hindsight, another decision may have led to a better result." (quotation marks omitted)).   And even if Jackson could show deficient performance, the Court would not find that he has proven that he was prejudiced by these comments.  Again, the thrust of the argument was that Hicks was immoral and considering all the evidence presented against Jackson, counsel merely taking out the reference to Jackson living in the same world with Hicks would not have changed the outcome of the trial.

### 10. Interstate Commerce Element

Next, Jackson argues that Lonergan was ineffective for failing to move for dismissal at the end of the Government's case on the basis that the Government failed to prove the interstate commerce element of Count One, the attempted Hobbs Act robbery.  Addendum 30–31; Second Mot. Suppl. 9–20.  He also argues that appellate counsel was ineffective for failing to argue that

the Government failed to establish the interstate commerce element.  *See* Second Mot. Suppl. 21.
The Government argues that Jackson's claim is unsupported and that "underlying case law fully
supported [its] contention that attempted robbery of illegal drugs (cocaine in this case)
constituted a violation of the Hobbs Act."  Resp. 2255. Mot. 36–37.  Lonergan states that he
made a strategic decision not to argue that the Government "fail[ed] to prove that [the alleged
robbery] did not affect interstate commerce" because he thought it was "a waste of time and a
distraction."  Lonergan Aff. ¶ 9.

"The Hobbs Act prohibits any robbery . . . or attempt . . . to rob that 'in any way or
degree obstructs, delays or affects commerce or the movement of any article or commodity in
commerce.'"  *United States v. Bailey*, 227 F.3d 792, 797 (7th Cir. 2000) (citing 18 U.S.C.
§ 1951(a)).  Case law provides that "if the Government proves beyond a reasonable doubt that a
robber targeted a [drug] dealer's drugs or illegal proceeds, the Government has proved beyond a
reasonable doubt that commerce over which the United States has jurisdiction was affected."
*Taylor v. United States*, 579 U.S. 301, 308 (2016).  "Factual impossibility and mistake of fact are
not defenses to an attempt crime."  *United States v. Wrobel*, 841 F.3d 450, 456 (7th Cir. 2016).
So it does not matter if the completed crime would not have actually affected interstate
commerce—there need only be evidence that a robbery was committed "with the specific intent
to" rob a business, person, or entity involved in interstate commerce.  *See id.* at 455–56 ("It does
not matter whether or not [the victim] was actually a diamond merchant engaged in interstate
commerce.  What matters is that the evidence demonstrated that [the defendants] acted with the
specific intent to rob a diamond merchant and took a substantial step toward robbing diamonds
from someone whom they believed to be a diamond merchant.").

Here, the evidence at trial showed that Defendants were attempting to steal illegal drugs. Hicks testified that the robbers said "[t]hey wanted a brick that was delivered to [her] grandma's [house]," meaning a "brick" of cocaine.  Trial Tr. Day One 137:8–138:13.  She testified that the robbers told her that her children's father had sent her drugs in the mail and they were going to take them.  *See id.* at 140:15–16.  Jon Johnson from the Drug Enforcement Administration testified that "'[b]rick' is a common term to refer to a kilogram of cocaine."  Trial Tr. Day Three 595:17–18.  As Defendants intended to steal illegal drugs and believed there were illegal drugs at the house they robbed, the interstate commerce element was established.  Lonergan decided not to make an argument that the Government failed to prove this element of the attempted Hobbs Act claim because he thought it was a waste of time.  Lonergan's strategy was reasonable in light of existing law.  And appellate counsel was not ineffective for failing to raise a clearly meritless argument on appeal.

### 11. Stipulation to Prior Conviction

Jackson argues that Lonergan was ineffective for failing to object to use of a stipulation that he claims was not knowingly, intelligently, and voluntarily signed.  Fourth Mot. Suppl. 2–5. Where a defendant stipulates that he has a prior felony conviction, the Government cannot introduce evidence of the prior conviction to establish that element of a § 922(g)(1) charge.  *Old Chief v. United States*, 519 U.S. 172, 191 (1997); *Fryer v. United States*, 243 F.3d 1004, 1007 (7th Cir. 2001).  Both Ledell and Deaunta indicated at the chambers conference before jury selection that they intended to stipulate that they had prior qualifying convictions.  *See* Trial Tr. Day One 11:14–19, 12:10–13:5.  On the first day of trial, Jackson had not agreed to stipulate that he had a prior felony conviction, *id.* at 47:18–21, but by the third day, he had changed his mind, Trial Tr. Day Three 605:6–8.  Ledell and Deaunta had signed one written stipulation conceding

33

that they both had prior convictions and then Jackson signed a separate written stipulation since

he decided to stipulate later.  *See id.* at 604:24–605:3.  For efficiency, the Court decided to

simply read part of the stipulation signed by Ledell and Deaunta and add Jackson's name.  *Id.* at

606:4–607:1.  When asked, the Court stated the following to the jury: "The parties in this case

stipulate and agree that prior to January 7th of 2017, each of the defendants – Deaunta Tyler,

Ledell Tyler and Dalvent Jackson – had been convicted of a felony offense."  *Id.* at 607:4–13.

Then in its closing, the Government stated that "all three defendants ha[d] stipulated that they

were felons prior to January 7th."  *Id.* at 730:15–17.

Although Jackson claims that his counsel should have objected to the Government's

statement in closing that he had stipulated to his prior conviction, Fourth Mot. Suppl. 3, his real

complaints seem to be that the Court read from a stipulation he did not sign, *id.* at 4, and that the

Government should have been required to prove that he knew he was a felon, *see id.* at 5.  There

is no deficient performance or prejudice here.  Jackson did sign a stipulation containing the

language the Court read, *see* Stipulations, ECF No. 45, so there was no reason to object to the

Court reading from the paper that Deaunta and Ledell signed and no prejudice from counsel's

failure to make such an objection.  Moreover, the stipulation did nothing more than concede that

Jackson had a prior felony conviction, which the record shows he does.  Without a stipulation,

the Government would have been able to introduce evidence that Jackson had been convicted of

delivery of heroin and aggravated battery, *see* PSR ¶¶ 61, 65, which would not be flattering to

Jackson.  If Jackson did not stipulate to the fact that he had previously been convicted of a

felony, the jury still would have found that he had been, so there is no prejudice from the

stipulation.

### 12. Cumulative Error

When deciding whether a counsel's errors prejudiced a defendant, courts are to consider the cumulative prejudicial effect of the counsel's errors rather than only analyzing the prejudicial effect of individual errors. *See Myers v. Neal*, 975 F.3d 611, 623 (7th Cir. 2020) ("Where, as here, the record shows more than one instance of deficient performance, the Sixth Amendment requires that we approach the prejudice inquiry by focusing on the cumulative effect of trial counsel's shortcomings."); *Washington v. Smith*, 219 F.3d 620, 634−35 (7th Cir. 2000) ("Evaluated individually, [counsel's] errors may or may not have been prejudicial to [the petitioner], but we must assess the totality of the omitted evidence under *Strickland* rather than the individual errors." (quotation marks omitted)). Here, Jackson has not convinced the Court that counsel made many, if any, errors. The Court presumed deficient performance in a few instances—with respect to an alibi investigation, suppression of the photo array identifications, the comments at closing, and the stipulation—and determined that there was no prejudice. Even considering these potential errors together, Jackson has not demonstrated a reasonable probability that absent counsel's errors, the result of the trial would be different.

In sum, Jackson's claim of ineffective assistance of counsel is DENIED.

### CONCLUSION

Accordingly, Defendant-Petitioner Dalvent Jera Jackson's motions to supplement, ECF Nos. 144, 149, 176, 194, 201, are GRANTED. His Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, ECF No. 129, as supplemented, is GRANTED IN PART and DENIED IN PART. Jackson's conviction on Count Two is VACATED, and he will be resentenced on Counts One and Five. Counsel will be appointed to

represent Jackson in the resentencing proceedings.  The Clerk is directed to enter judgment on

the § 2255 proceeding and close the accompanying civil case, 4:20-cv-04213-SLD.


Entered this 26th day of September, 2024.

s/ Sara Darrow
_____
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE
